1
2
3
4
5
6
7        **UNITED STATES DISTRICT COURT**
8        **SOUTHERN DISTRICT OF CALIFORNIA**
9

10   XNERGY,                                      CASE NO. 06cv343 WQH (BLM)
                              Plaintiff,
11        vs.                                     **ORDER**
12   HESS MICROGEN, LLC,                          (Doc. # 44)
                              Defendant.
13   ─────────────────────────────
14   AND RELATED COUNTERCLAIM
15

16   HAYES, Judge:
17          The matter before the Court is the Motion for Summary Judgment filed by Defendant
18   Hess Microgen, LLC ("Hess").  (Doc. # 44.)
19   **I.      Background**
20          On April 16, 2004, Plaintiff Xnergy signed a contract with Onsite Energy Providers,
21   LLC ("OSEP") to engineer, purchase and install cogeneration systems on the roof of two office
22   buildings known as Treat Towers in Walnut Creek, California (the "EPC Contract").[1]  (Davis
23   Decl., Doc. # 61, ¶ 3.)  Also on April 16, 2004, Xnergy and Hess entered into an Agreement
24   for Purchase and Sale of Equipment ("Purchase Agreement"), wherein Hess agreed to
25   construct, and Xnergy agreed to buy, two cogeneration systems for the Treat Towers for a
26   purchase price of $1,027,776.  (Smith Decl., Doc. # 51, Ex. A at 897.)
27   ─────────────────────
28          [1]  "Cogeneration" refers to the use of a single engine generator to simultaneously
     produce both electric and thermal power.  (Doc. # 45 at 2.)

The purchase price was to be paid in four installments made at different points along the manufacturing process.  According to the Purchase Agreement: "Upon execution of this Agreement, [Xnergy] shall pay [Hess] a non refundable deposit equal to twenty five percent (25%) of the Purchase Price ('Deposit').  [Hess] agrees that the Deposit will be returned to [Xnergy] in the event that [Hess] unilaterally cancels this Agreement without cause and at a time prior to shipment."  (*Id.*)  On April 16, 2004, Xnergy paid the deposit of $256,941.50.  (Davis Decl. ¶ 5.)  The Purchase Agreement further provides: "Upon successful completion of witness testing in Carson City and prior to delivery," the second payment of fifty percent (50%) of the purchase price would be due.  (*Id.* at 898.)  The third payment of fifteen percent (15%) would be due at the time of shipment.  (*Id.*)  The fourth and final payment of ten percent (10%) would be due at start-up of the cogeneration systems.  (*Id.*)

The Purchase Agreement provides that certain equipment would be "mounted" and/or "installed" on "steel equipment skids" by Hess.  (*Id.* at 906-15.)  However, "[s]pecifically excluded from th[e] [Purchase] Agreement are any and all services related to installation, permitting, utility interconnection, integration of the Goods with building facility, and civil, electrical, mechanical or other systems beyond the border of the skids."  (*Id.* at 897.)  The Purchase Agreement also requires Hess to submit various "documentation" and "drawings" to Xnergy, some of which are to be submitted "for written approval by Xnergy."  (*Id.* at 916.)

 Soon after entering into the contract, the parties began to disagree over whether each party was performing according to the terms of the Purchase Agreement.  Hess claims that the congeneration systems have been fully constructed and "witness tested," and are now ready for shipment.  Xnergy claims that the congeneration systems have not been designed or constructed according to the terms of the Purchase Agreement and have not been "witness tested."  Xnergy has refused to accept delivery of the congeneration systems and has not paid any additional amount of the purchase price beyond the initial deposit.

On January 17, 2006, Xnergy instituted this action by filing a Complaint against Hess in San Diego County Superior Court, alleging two causes of action: (1) breach of contract, and (2) breach of the duty of good faith and fair dealing.  In the first cause of action, Xnergy

1    alleges that Hess breached the Purchase Agreement (i) by failing to build and deliver the

2    cogeneration systems with the agreed-upon skid system (Compl. ¶¶ 7-8), (ii) by missing

3    deadlines to submit documents to Xnergy for approval (Compl. ¶ 8), and (iii) by failing to

4    perform witness tests on the entire cogeneration skid (Compl. ¶¶ 7-9).  Because of these

5    alleged breaches, Xnergy seeks return of its deposit and cancellation of the Purchase

6    Agreement. (Compl. ¶ 10.)  In the second cause of action, Xnergy alleges Hess breached the

7    implied duty of good faith and fair dealing by insisting that Xnergy waive deficiencies and pay

8    the payment of 50% of the contract price, by unreasonably limiting and then cutting off

9    communications with Xnergy, and by communicating with Xnergy's customer and seeking to

10   oust Xnergy from the Treat Towers project and other projects.  (Compl. ¶ 13.)  Due to the

11   alleged breach of the implied duty of good faith and fair dealing, Xnergy seeks return of its

12   deposit, cancellation of the Purchase Agreement, and general and special damages. (Compl.

13   ¶ 14.)

14           On February 14, 2006, Hess removed the case to this Court, properly alleging diversity

15   jurisdiction. (Doc. # 1.)  On February 28, 2006, Hess filed a Counterclaim (Doc. # 5), and on

16   March 14, 2007, Hess filed a First Amended Counterclaim for breach of contract against

17   Xnergy, seeking the unpaid balance of the purchase price allegedly due under the Purchase

18   Agreement, as well as the costs of storing the two fully-constructed cogeneration systems

19   (Doc. # 42).  Among Xnergy's affirmative defenses to Hess' First Amended Counterclaim is

20   for "Anticipatory Breach of Contract."  (Doc. # 8 at 3; Doc. # 36; Doc. # 41.)

21           On March 28, 2007, Hess filed its Motion for Summary Judgment in this Court, seeking

22   summary judgment in its favor as to each of the two causes of action in Xnergy's Complaint

23   and the single cause of action in Hess' First Amended Counterclaim. (Doc. # 44.)  After

24   receiving evidence and briefing from both parties, the Court conducted oral argument on July

25   9, 2007.

26   **II.    Discussion**

27           **A.    Standard of Review**

28           Summary judgment is proper when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

**B.    Xnergy's Claim for Breach of Contract**

Under California law,[2] the elements of a cause of action for breach of contract are: (1) the existence of a contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach and (4) damages resulting to plaintiff because of the breach. *See Armstrong Petroleum Corp. v. Tri-Valley Oil and Gas Co.*, 116 Cal. App. 4th 1375, 1391 (2004). The parties agree that the Purchase Agreement constitutes a contract.

Xnergy alleges that Hess breached the Purchase Agreement (i) by failing to build and deliver the cogeneration systems with the agreed-upon skid system (Compl. ¶¶ 7-8), (ii) by missing deadlines to submit documents to Xnergy for approval (Compl. ¶ 8), and (iii) by

---

[2] The Purchase Agreement provides: "This Agreement will be construed and enforced in accordance with the laws of the State of California, without regard to the principles, provisions or policies thereof relating to conflict of laws." (Smith Decl., Ex. A at 899.) The parties agree that California substantive law applies in this action.

failing to perform witness tests on the entire cogeneration skid (Compl. ¶¶ 7-9).  Hess moves for summary judgment as to each of these alleged breaches of contract.

### 1.   Skid System

Hess' President testified that the language in the Purchase Agreement, "Package Skid 4 of 8'-11' x 15-25' steel equipment skids" (Smith Decl., Ex. A at 915), meant that Hess was to deliver two skids per Treat Tower, and each of the skids would be between 8 feet to 11 feet by 15 feet to 25 feet.  (Smith Dep. at 30-32.)  During the summer of 2004, after the Purchase Agreement was signed, Hess changed the design from two to three skids per tower.  (Smith Dep. at 26, 32, 62; Fine Dep. at 63; Allen Dep. at 34-35; Jackson Dep. at 91.)

The change in skid design led to a dispute between Xnergy and Hess concerning certain equipment which would no longer fit on the original two skids.  (Fine Dep. at 58-59.) Specifically, the change in design required installation work on the electrical panels, batteries, battery chargers, silencers and cooling towers to be performed on the roof that, under the original two-skid design, would have been performed by Hess in its factory because all of this equipment would have fit within "the border of the skids."  (Smith Decl., Ex. A at 897; Smith Dep. at 46-47, 51-52; Costello Dep. at 15-18; Allen Dep. at 34-35; Jackson Dep. at 157-58; Davis Decl. ¶ 7.)  Hess took the position that the Purchase Agreement did not require Hess to perform any installation work on the roof.  (Smith Dep. at 46-47; Davis Decl. ¶ 7 ("In connection with changing from two to three skids, Hess . . . told me that it would not install various pieces of significant equipment on the skids, and that Xnergy itself would have to install the equipment on the roofs of the buildings.  Specifically, despite what I thought was clear contractual language requiring installation by Hess, Hess told me that it would not install electrical panels, batteries, battery chargers, silencers, or cooling towers.").)  Hess relied upon the following language in the Purchase Agreement: "Specifically excluded from this Agreement are any and all services related to installation . . . beyond the border of the skids." (Smith Decl., Ex. A at 897 (emphasis in original).)  Meanwhile, Xnergy argued that Hess should perform the additional installation, relying upon the language in the Purchase Agreement which provides that numerous pieces of equipment, including the electrical panel,

1    the battery charger and the engine, would be "installed," "installed on skid," or "skid or engine
2    mounted" by Hess.  (Smith Decl., Ex. A at 906-915.)

3        Hess blames Xnergy for the change in skid design, contending that the changes were
4    necessitated by Xnergy's failure to provide accurate measurements of the available roof space
5    for the congeneration system prior to the signing of the contract.  (Smith Dep. at 47; Fine Dep.
6    at 120-21; Davis Dep. at 60.)  Xnergy counters with evidence that Hess had access to the roof
7    and studied the roof layout prior to signing the contract.  (Davis Dep. at 138.)  Also, Xnergy's
8    Vice-President testified that "we later know that's not true" that the electrical panel would not
9    fit onto a skid in the space allowed.  (Davis Dep. at 115-16.)  This evidence is sufficient to
10   create an issue of fact as to which party was responsible for the change in skid design from two
11   to three skids, as well as the resulting shift in the burden of installation.

12       Hess argues that after the contract was signed, Xnergy's Vice-President acknowledged
13   that the electrical panel would be mounted off the skid (Davis Dep. at 115-16), and an Xnergy
14   engineer signed a drawing portraying the electrical panel off the skid (Davis Dep. at 116-17,
15   126).  Hess contends that this evidence establishes that the Purchase Agreement was orally
16   modified.  (Mem. Supp. Mot. Summ. J., Doc. # 45, at 14-15.)

17       California Civil Code § 1698(b) provides: "A contract in writing may be modified by
18   an oral agreement to the extent that the oral agreement is executed by the parties."  "'Executed'
19   in § 1698(b) has the normal meaning of that term in contract law.  That is, the agreement must
20   have been fully performed." *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075,
21   1080-81 (9th Cir. 2005) (citing *Lockheed Missiles & Space Co. v. Gilmore Indus.*, 135 Cal.
22   App. 3d 556, 559 (1982); *see also* Cal. Civ. Code § 1661 ("An executed contract is one, the
23   object of which is fully performed.").  "Accordingly it is well settled that in order to be
24   'executed' an agreement must be fully performed on both sides." *Lockheed Missiles & Space*
25   *Co.*, 135 Cal. App. 3d at 559 (citations omitted).  "Whether a written contract has been
26   modified by an executed oral agreement is a question of fact." *MacIsaac & Menke Co. v.*
27   *Cardox Corp.*, 193 Cal. App. 2d 661, 670 (1961) (citation omitted).

28       Xnergy presents evidence that Xnergy's Vice-President repeatedly objected to the

1   changes. (Fine Dep. at 58-59; Smith Dep. at 34-35; Davis Decl. ¶ 6.) According to Xnergy's

2   Vice-President: "I never discussed with anyone at Hess the idea that our subcontract was not

3   binding as to the number of skids and dimensions but was merely an estimate of possibilities.

4   Also, I never signed any change order to the subcontract with Hess about this or anything else,

5   nor did anyone else for Xnergy. Instead, I repeatedly objected to changes in the number of

6   skids and the related impact with equipment falling off the skids instead of remaining as

7   installed items."[3] (Davis Decl. ¶ 6; *see also* Davis Decl. ¶ 10 ("I had complained that Hess was

8   rushing to complete the job without first providing the required detailed plans and drawings

9   and without approvals. In addition, I complained many times that Hess was failing to include

10  all of the equipment on skids so that the units would be 'plug and play' as promised, with

11  minimal labor needed on the building rooftops.").) Hess's President responded to Xnergy's

12  objections and complaints by stating that the equipment would not be fully contained within

13  the borders of the two skids as originally planned, and that Xnergy should "forget about it,"

14  "it was not going to happen," "let's move on to something else," and, "That's it. That's all I

15  am going to do for you." (Davis Dep. at 108-09, 124-25.) Xnergy's Vice-President testified:

16  "I had to say, 'Well, I guess if that's all you're going to do, then I have to concede, because

17  I can't force you other than a suit to make you put it back on the skid.'" (Davis Dep. at 109.)

18  Xnergy's Vice-President further testified that "we later know that's not true" that the electrical

19  panel would not fit onto the skid in the space allowed. (Davis Dep. at 115-16.)

20      Even if the evidence were undisputed that Hess and Xnergy orally agreed to modify the

21  contract specifications by placing the electrical panel off the skid, there is no evidence that

---

23  [3] Hess argues that this statement from paragraph six of the Declaration of Xnergy's
24  Vice-President, Jason Davis, should be disregarded because it contradicts his earlier deposition
    testimony that the parties intended "how the skid would be shaped and the area it would go
    into" to be "malleable." (Davis Dep. at 143.) Davis' deposition testimony never states that
25  "malleability" would go beyond the size and shape of the skid. He did not testify that the
    parties contemplated that the number of skids would increase. The Court finds that Davis'
26  deposition testimony does not "flatly contradict" his affidavit testimony. *Kennedy v. Allied
    Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (holding that the "rule in the Ninth Circuit .
27  . . that a party cannot create an issue of fact by an affidavit contradicting his prior deposition
    testimony" only applies to "'sham' testimony that flatly contradicts earlier testimony in an
28  attempt to 'create' an issue of fact and avoid summary judgment") (citations omitted).
    Therefore, the Court considers paragraph six of the Davis Declaration.

Xnergy performed its side of the purported oral contract, i.e., paying Hess for the work.  *See Lockheed Missiles & Space Co.*, 135 Cal. App. 3d at 559 ("[I]t is unlikely that repairs had been completed *or that M.B. had been compensated for performing such repairs* prior to Wichman's death.  Accordingly, it is extremely doubtful that the purchase agreement had been performed on both sides.") (emphasis added); *cf. Fanucchi & Limi Farms*, 414 F.3d at 1081 ("Fanucchi's own argument defeats its claim under § 1698(b), for it argues that United breached its obligation under the oral agreement because it failed to perform the unexecuted part of the agreement."); *Klein Norton Co. v. Cohen*, 107 Cal. App. 325, 330 (1930) ("The principle is well established that an agreement, in order to be executed, must be fully performed on both sides.  This principle is strictly enforced when an attempt is made to set up a modification of a written contract by an oral one, under section 1698 of the Civil Code.").  Therefore, Hess has failed to show as a matter of law that the alleged oral agreement was fully performed by both sides.[4]  In the absence of an oral modification under Cal. Civil Code § 1698, there is an issue of fact as to whether Hess breached the contract between the parties by changing the skid system from two to three skids.

Finally, even if Hess had shown as a matter of law that the Purchase Agreement was orally modified and executed, Hess at most has shown that Xnergy agreed to the electrical panels being off the skid.  (Fine Dep. at 129-30; Davis Dep. at 115-17.)  There is evidence that "in connection with changing from two to three skids, Hess additionally told [Xnergy] that it would not install various pieces of significant equipment on the skids," including equipment other than the electrical panels, such as batteries, battery chargers, silencers and cooling towers, which "Xnergy . . . would have to install . . . on the roofs of the buildings."  (Davis

---

[4]  This situation can be distinguished from the principle that "[a]n oral agreement fully executed by one party, if supported by consideration, will constitute a valid modification of a prior written agreement."  *MacIsaac & Menke Co. v. Cardox Corp.*, 193 Cal. App. 2d 661, 670 (1961) (citing *D.L. Godbey & Sons Construction Co. v. Deane*, 39 Cal. 2d 429, 433 (1952)).  Hess has not shown that the purported oral modification is supported by any new consideration, and therefore, even if Hess fully executed its portion of the purported oral agreement, it is insufficient to transform the purported oral agreement into a valid modification of the written Purchase Agreement.  *See Beggerly v. Gbur*, 112 Cal. App.3d 180, 190 (1980) (holding that an alleged oral modification of written agreement was invalid and ineffective since it was not supported by new consideration, despite plaintiff's contention that his performance alone sufficed to render oral modification "executed").

1   Decl. ¶ 7.)  Under the two-skid system set out in the Purchase Agreement, these items were to

2   be "installed" or "installed on skid" or "skid mounted" by Hess.  (Smith Decl., Ex. A at 908,

3   913.)  Hess has failed to show that the purported oral modification encompassed the additional

4   installation work (beyond that related to the electrical panels) which was shifted to Xnergy

5   when the third skid was added.  Thus, even if the Purchase Agreement was orally modified

6   under Cal. Civil Code § 1698 as to the electrical panels being off-skid, there would remain an

7   issue of fact as to whether Hess breached the Purchase Agreement by changing the skid system

8   from two to three skids, thereby shifting installation work from Hess to Xnergy.  Therefore,

9   Hess' motion for summary judgment on this ground is denied.

10                     **2.       Submission of Documentation**

11         The Purchase Agreement specifies the following "[d]rawings [are] to be submitted [to

12   Xnergy from Hess] 2 weeks after order: Shipping dimensions and weight[,] [m]echanical

13   connection drawings[,] [o]utlines and footprint drawings as required for installation."  (Smith

14   Decl., Ex. A at 916.)  The Purchase Agreement specifies the following "[d]rawings [are] to be

15   submitted [to Xnergy from Hess] 4 weeks after order: Mechanical drawings, equipment

16   schedules for written approval by Xnergy."  (Smith Decl., Ex. A at 916.)

17         Xnergy presents evidence that Hess submitted the drawings after the deadlines provided

18   in the Purchase Agreement.  (Gosselin Dep. at 68-70; Jackson Dep. at 145-47.)  When the

19   drawings and other documents were submitted by Hess, Xnergy found the submissions to be

20   "grossly incomplete."  (Gosselin Dep. at 68-69;  *see also* Jackson Dep. at 143-46; Allen Dep.

21   at 58-60.)    There is an issue of fact as to whether Xnergy nonetheless approved the

22   submissions or otherwise waived any alleged inadequacies.  (*Compare* Allen Dep. at 67-68

23   (Hess requested from Xnergy an engineering review stamp to indicate approval of the

24   drawings, but Hess "never got [Xnergy] to officially give [Hess] that"), 71; Davis Decl. ¶ 10

25   ("I had complained that Hess was rushing to complete the job without first providing the

26   required detailed plans and drawings and without approvals."); *and* Fine Dep. at 86, 138-39;

27   *with* Davis Dep. at 116-17 (Xnergy's engineer signed and commented upon Hess' mechanical

28   drawings which show the electrical panel off the skid).)  There also is an issue of fact as to

1  whether the tardy and/or incomplete submissions caused Xnergy any damages. (Gosselin Dep.

2  at 68-70; Jackson Dep. at 145-47 (tardy submission delayed Xnergy's ability to receive

3  approval from county officials, and delayed Xnergy in meeting its schedule for OSEP).)

4  Finally, there also is an issue of fact as to which party should bear the blame for the delays.

5  (*Compare* Smith Dep. at 47, Fine Dep. at 120-21 & Davis Dep. at 60 (changes in skid design

6  were necessitated by Xnergy's failure to provide accurate measurements of the available roof

7  space for the congeneration system prior to the signing of the contract); *with* Davis Dep. at 138

8  (Hess had access to the roof and studied the roof layout prior to signing the contract).)

9      Therefore, there are issues of fact as to whether Hess breached the Purchase Agreement

10  by failing to submit timely and/or complete documentation, and Hess' motion for summary

11  judgment on this ground is denied.

12              **3.    Witness Tests**

13      The Purchase Agreement provides that "[u]pon successful completion of witness testing

14  in Carson City and prior to delivery," the second payment of fifty-percent (50%) of the

15  purchase price was due.  (Smith Decl., Ex. A at 898.)  Hess has demanded this second

16  payment, claiming that witness testing was successfully completed in Carson City in

17  September 2004 and on December 2, 2004.  Xnergy refuses to pay, arguing, *inter alia*, that the

18  Purchase Agreement entitled Xnergy to demand inspection and testing of the entire

19  congeneration system, rather than just the engines (as was tested in September 2004 and on

20  December 2, 2004).  After December 2, 2004, no additional testing has been performed on the

21  congeneration systems.  (Davis Decl. ¶ 12; Timer Dep. at 49; Smith Dep. at 77.)

22      The Purchase Agreement does not define "witness testing."  However, the Purchase

23  Agreement states: "Unit to be commissioned and tested by vendor, in cooperation with

24  Xnergy.  Test performance to be documented.  Tests shall include:  Manufacturer's bench test

25  Genset 4 hr test in Carson City, NV.  Xnergy reserves the right to witness the tests."  (Smith

26  Decl., Ex. A at 915.)  Hess takes the position that the only "witness testing" required by the

27  Purchase Agreement is the explicitly referenced "manufacturer's bench test" of the "genset"

28  (otherwise known as a "UL test," *see* Smith Dep. at 72-73).  Hess presents evidence that on

December 2, 2004, an Xnergy representative signed a "Witness Test Acknowledgment," acknowledging that the genset testing was performed. (Amended Counterclaim, Doc. # 42, Ex. B.)

However, there is evidence that the parties contemplated inspection and testing of the assembled skids, in addition to UL testing. (Davis Dep. at 172; *see also* Davis Decl. ¶ 14; Notice of Lodgement, Doc. # 61, Ex. 12-13; Timer Dep. at 40-42 (meeting minutes between the parties indicating that additional testing beyond UL testing would be done).) Additionally, Hess' expert testified that in the industry, it is not ordinary "to consider a UL test to be the same thing as the witness testing." (Timer Dep. at 35.) Two former Hess employees testified that witness testing is not equivalent to UL testing. (Fine Dep. at 48; Allen Dep. at 45.) A former Hess engineer testified: "UL is a specific set of guidelines used to get a UL certification on a piece of equipment. A witness test is whatever the customer wants to see." (Fine Dep. at 48-49.) Xnergy presents evidence that it wanted to see testing of the skid system as a whole. (Davis Decl. ¶¶ 9, 11.)

Hess argues that all of the evidence in the preceding paragraph should be excluded by the parol evidence rule. "The parol evidence rule is a fundamental rule of contract law which operates to bar extrinsic evidence contradicting the terms of a written contract." *BMW of North Am., Inc. v. New Motor Vehicle Bd.*, 162 Cal. App. 3d 980, 991 (1984) (citation omitted). "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003) (citation omitted). The Court finds that the extrinsic evidence offered by Xnergy (summarized in the preceding paragraph) "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* The Purchase Agreement does not define "witness testing," nor does its language prohibit the interpretation advocated by Xnergy. Therefore, Hess' objection to the extrinsic evidence is overruled.

1    In light of this extrinsic evidence, the Court finds that there is an issue of fact as to
2    whether the "witness testing," as referenced in the Purchase Agreement, was fully performed.
3    *Cf. Byrne v. Laura*, 52 Cal. App. 4th 1054, 1066-67 (1997) ("The fundamental goal of
4    contractual interpretation is to give effect to the mutual intention of the parties, and questions
5    of intent and purpose are ordinarily questions of fact.  Where, as here, the agreement is
6    reasonably susceptible of different interpretations, summary adjudication is an inappropriate
7    means of resolving the ambiguity.") (quotations and citations omitted).

8    Hess also argues that Xnergy has made a binding admission that the "witness testing,"
9    as referenced in the Purchase Agreement, was fully performed.  Hess' Counterclaim alleges,
10   at paragraph 37: "In September 2005 [sic] each of the two Gensets was witness tested at
11   Defendant's Carson City, Nevada facility.  Plaintiff was notified of such witness tests and
12   elected not to attend.  Thereafter, on December 6, 2004, each of the two Gensets was again
13   witness tested at Defendant's Carson City, Nevada facility under the observation of Plaintiff's
14   representatives who signed a Witness Test Acknowledgement for each Genset . . . confirming
15   the acceptance of such tests."  (Answer and Counterclaim, Doc. # 5, ¶ 37.)  Xnergy's Answer
16   to the Counterclaim "admits the allegations of paragraph 37."  (Answer to Counterclaim, Doc.
17   # 8, ¶ 3.)[5]  Hess argues that this constitutes a binding admission that the "witness testing," as
18   referenced in the Purchase Agreement, was fully performed.

19   "[U]nder federal law, stipulations and admissions in the pleadings are generally binding
20   on the parties and the Court.  Not only are such admissions and stipulations binding before the
21   trial court, but they are binding on appeal as well.  Judicial admissions are formal admissions

23   [5]   On January 26, 2007, Hess filed a Motion for Leave to File an Amended
24   Counterclaim.  (Doc. # 27.)  Paragraph 9 of the proposed Amended Counterclaim is identical
     in all material aspects to paragraph 37 of the Answer and Counterclaim, except that the year
25   "2005" in paragraph 37 of the Answer and Counterclaim was changed to "2004" in paragraph
     9 of the proposed Amended Counterclaim.  On February 16, 2007, Xnergy filed a "Statement
26   of Non-Opposition to Hess Microgen's Motion to Amend Counterclaim," stating that "Xnergy
     has no opposition to Hess Microgen's request for leave to file the Amended Counterclaim
27   proposed," but also stating, "Xnergy asks that the Court modify the Order proposed by Hess
     Microgen to deem Xnergy's existing Answer to be the answer to the Amended Counterclaim."
28   (Doc. # 36.)  On March 6, 2007, the Court granted Hess' Motion for Leave to File an Amended
     Counterclaim and stated that "Xnergy's existing Answer will be deemed the answer to the
     Amended Counterclaim."  (Doc. # 41.)

1  in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly

2  with the need for proof of the fact.  Factual assertions in pleadings and pretrial orders, unless

3  amended, are considered judicial admissions conclusively binding on the party who made

4  them. . . .  A statement in a complaint, answer or pretrial order is a judicial admission, as is a

5  failure in an answer to deny an allegation." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224,

6  226 (9th Cir. 1988) (quotations and citations omitted).  "Where, however, the party making an

7  ostensible judicial admission explains the error in a subsequent pleading or by amendment, the

8  trial court must accord the explanation due weight." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848,

9  859-60 (9th Cir. 1995) ("In opposing summary judgment, Sicor explained that, 'By saying

10 litigation to judgment, the parties did not mean that there would be no settlement' rather, the

11 parties intended only that CBVT would litigate its claims 'fully and aggressively' and with

12 Sicor's interests in mind.  We conclude that Sicor retracted its judicial admission by

13 subsequently recharacterizing the alleged oral agreement in its opposition to CBVT's motion

14 for summary judgment.").

15     At oral argument, Xnergy explained that its admission of Paragraph 37 is consistent

16 with its position throughout this litigation that while the gensets were witness tested, the

17 gensets are only a fraction of the congeneration systems described in the Purchase Agreement

18 and subject to the Purchase Agreement's "witness testing" requirement.   Xnergy has

19 consistently made this distinction in its Complaint, its Answer to the Counterclaim, and its

20 summary judgment brief.  (Compl., Doc. # 1, ¶ 9; Answer to Counterclaim, Doc. # 8, ¶¶ 2, 5;

21 Mem. Opp'n Mot. Summ. J., Doc. # 61, at 6-10.)  Pursuant to the Ninth Circuit's instruction

22 in *Sicor*, the Court accords Xnergy's explanation "due weight," *Sicor*, 51 F.3d at 859-60, and

23 finds that Xnergy's admission of the allegations in Paragraph 37 of the Answer and

24 Counterclaim does not constitute a binding judicial admission that the "witness testing," as

25 referenced in the Purchase Agreement, was fully performed.

26     For the reasons stated above, the Court finds that there is an issue of fact as to whether

27 Hess breached the Purchase Agreement by failing to fully perform "witness testing."

28 Therefore, Hess' motion for summary judgment on this ground is denied.

**C.     Breach of the Duty of Good Faith and Fair Dealing**

Hess moves for summary judgment as to Xnergy's claim that Hess breached the implied covenant of good faith and fair dealing.

"[U]nder California law, all contracts have an implied covenant of good faith and fair dealing."  *In re Vylene Enters., Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996) (citing *Harm v. Frasher*, 181 Cal. App. 2d 405, 417 (1960)).  The covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349 (2000).  However, the covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Id.*  Thus, to the extent a plaintiff seeks to impose limits "*beyond* those to which the parties actually agreed, the [implied covenant] claim is invalid.  To the extent the implied covenant claim seeks simply to invoke terms to which the parties *did* agree, it is superfluous."  *Id.* at 352 (emphasis in original).  "The central teaching of *Guz* is that in most cases, a claim for breach of the implied covenant can add nothing to a claim for breach of contract."  *Lamke v. Sunstate Equip. Co., LLC.*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004).

Nevertheless, a plaintiff may bring an implied covenant claim where the plaintiff alleges that the defendant acted in bad faith to frustrate the contract's benefits.  *See Guz*, 24 Cal. 4th at 353 n.18 (acknowledging that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled. . . ."); *see also McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1153 (N.D. Cal. 2002) (applying California law).  For instance, in *In re Vylene Enterprises*, a franchisee without any exclusive territory claimed the franchisor breached the implied covenant by placing a competing business just a mile-and-a-half away.  The Ninth Circuit held that under California law, the franchisee "did not have any rights to exclusive territory under the terms of the franchise agreement, and we do not impliedly read any such rights into the contract.  However, [the franchisor]'s construction of a competing restaurant within a mile and a half of [the franchisee]'s restaurant was a breach of the covenant of good

faith and fair dealing.  The bad faith character of the move becomes clear when one considers that building the competing restaurant had the potential to not only hurt [the franchisee], but also to reduce [the franchisor]'s royalties from [the franchisee]'s operations."  *In re Vylene Enters.*, 90 F.3d at 1477.

Xnergy presents the following evidence in support of its claim that Hess breached the implied covenant of good faith and fair dealing: a Hess representative tried to oust Xnergy from the Treat Towers project by telling an OSEP representative that Xnergy was "going to go out of business any moment and that . . . Hess should be working directly for [OSEP]" (Gosselin Dep. at 38-39), and that OSEP "shouldn't be[] working with a small company like Xnergy, [Hess and OSEP] should be two big companies working together" (Davis Dep. at 197);[6] when disputes arose over the meaning of "witness testing," Hess did not speak to its own salesperson despite Xnergy's complaints that Hess' salesperson made promises consistent with Xnergy's claims (Smith Dep. at 81); Hess' President testified that it was "customary" for Hess to do testing beyond just "genset" or "UL testing" prior to shipment of cogeneration systems (Smith Dep. at 76-77), yet Hess persisted in refusing to perform any additional testing on Xnergy's congeneration systems; and "[o]n December 20, 2005, after months of negotiations to resolve the impasse, Xnergy and Hess reached a tentative resolution by agreeing to disagree and move forward, but the resolution soon fell through when Hess refused to send a new invoice for its second progress payment stating simply 'Per Contract' and instead insisted on the invoice stating that Hess had in fact successfully completed witness testing" (Davis Decl. ¶ 16).  This evidence is sufficient to raise an issue of fact as to whether Hess acted in bad faith to frustrate Xnergy's right to receive the benefits of the Purchase

---

[6] Hess responds to the evidence that Hess tried to oust Xnergy from the Treat Towers project with testimony from Xnergy's President that "in August of 2005 one of the proposals on the table was for Hess to contract directly with OSEP for the Treat Towers project." (Gosselin Dep. at 97.)  Viewing the evidence in the light most favorable to Xnergy, this evidence does not negate the inference of bad faith from testimony that Hess was trying to oust Xnergy from the Treat Towers project *prior to* August of 2005.  Xnergy's President testified that "over a period of several months leading up to and subsequent to the signing of the Treat Towers contract [in April 2004]," a Hess representative told OSEP representatives that Xnergy was "going to go out of business any moment and that . . . Hess should be working directly for [OSEP]."  (Gosselin Dep. at 38-39.)

1  Agreement.  Bad faith is particularly shown by the evidence that Hess allegedly "refused to

2  send a new invoice for its second progress payment stating simply 'Per Contract' and instead

3  insisted on the invoice stating that Hess had in fact successfully completed witness testing,"

4  which, viewed in the light most favorable to Xnergy, potentially cost Hess the amount of the

5  "second progress payment."  (Davis Decl. ¶ 16.)  *See In re Vylene Enters.*, 90 F.3d at 1477

6  ("The bad faith character of the move becomes clear when one considers that building the

7  competing restaurant had the potential to not only hurt [the franchisee], but also to reduce [the

8  franchisor]'s royalties from [the franchisee]'s operations.").  Hess' motion for summary

9  judgment as to Xnergy's claim that Hess breached the implied covenant of good faith and fair

10  dealing is denied.

11    **D.    Hess' Counterclaim for Breach of Contract**

12    Hess alleges that Xnergy breached the Purchase Agreement by failing to pay the

13  remaining balance due on the purchase price.  Hess argues that the "witness testing" has been

14  completed and that all other conditions precedent have been completed for delivery of the

15  cogeneration systems, and therefore Hess is entitled to summary judgment on its First

16  Amended Counterclaim.  However, as discussed above, the Court finds that there are genuine

17  issues of material fact as to whether Hess fully performed "witness testing," and as to whether

18  Hess otherwise breached the Purchase Agreement by changing the skid system and/or by

19  failing to submit timely and/or complete documentation.  Because of these issues of fact, the

20  motion for summary judgment as to Hess' First Amended Counterclaim is denied.

21    **E.    Xnergy's Affirmative Defense of "Anticipatory Breach of Contract"**

22    Hess moves for summary judgment as to Xnergy's affirmative defense of "Anticipatory

23  Breach of Contract."[7]  Xnergy did not address this issue in its brief in opposition to the

24  summary judgment motion.

25

26    _____

      [7]  A Court may grant partial summary judgment as to an affirmative defense.  *See* Fed.
27  R. Civ. P. 56; *see also Fantasyland Video, Inc. v. County of San Diego*, 373 F. Supp. 2d 1094,
   1102-03 (S.D. Cal. 2005) ("When proper grounds for granting summary judgment have not
28  been established, '[s]ummary adjudication may be appropriate on clearly defined, distinct
   issues.'") (quoting *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1029 (E.D. Cal. 2002);
   citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990)).

One of Xnergy's affirmative defenses to Hess' First Amended Counterclaim is as follows: "Xnergy was relieved of any further payment obligation because Hess previously breached the Contract by refusing to allow Xnergy the opportunity to review and approve designs and plans, and by Hess' previous anticipatory breach of the Contract by announcing its inability or refusal to comply with requirements that all equipment be skid mounted." (Doc. # 8 at 3; *see also* Docs. # 36 & 41.)

Under California law:

> Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract. The repudiation may be express or implied. An express repudiation is a clear, positive, unequivocal refusal to perform; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible.
> When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time.

*Taylor v. Johnston*, 15 Cal. 3d 130, 137 (Cal. 1975) (citations omitted).

Assuming Hess anticipatorily repudiated the Purchase Agreement, under California law, Xnergy "face[d] an election of remedies": either treat Hess' repudiation as an anticipatory breach and immediately seek damages, or "wait until the time for performance arrives and exercise [its] remedies for actual breach if a breach does in fact occur at such time." *Id.* Xnergy did not terminate the contract or sue for breach of contract at the time of the alleged anticipatory repudiation. Instead, Xnergy waited until January 2006 to file this action, approximately 17 months after Xnergy was aware that Hess allegedly changed the skid design and failed to submit documentation and/or submitted incomplete documentation. (*See* Davis Decl. ¶¶ 10, 15 (disputes between Xnergy and Hess regarding documentation and skid design occurred "in the early fall of 2004").) Xnergy's decision to wait until Hess was required by the Purchase Agreement to perform constitutes an election of remedies under California law, and precludes Xnergy's "Anticipatory Breach of Contract" affirmative defense. Therefore, Hess' motion for summary judgment as to Xnergy's affirmative defense of "Anticipatory Breach of Contract" is granted.

**F.    Xnergy's Remedy of Recission**

Hess moves for "summary judgment of Xnergy's alleged rescission remedy." (Mem. Supp. Mot. Summ. J., Doc. # 45, at 18.)   Hess relies upon the following principles of California law:

> When one party has been injured by a breach of contract and she either lacks the ability or the desire to keep the contract alive, she can choose between two different remedies.  She can treat the contract as rescinded and recover damages resulting from the rescission.  Or she can treat the contract as repudiated by the other party and recover damages to which she would have been entitled had the other party not breached the contract or prevented her performance.  An action for rescission is based on the disaffirmance of the contract and an action for damages for breach of contract is based on its affirmance.   An action for rescission and an action for breach of contract are alternative remedies.  The election of one bars recovery under the other.

*Akin v. Certain Underwriters At Lloyd's London*, 140 Cal. App. 4th 291, 296 (2006) (citations omitted).

Xnergy responds in its brief in opposition to the summary judgment motion: "[N]owhere in the Complaint does Xnergy make a claim for rescission or even mention the word 'rescind.'  Consequently, Hess' motion challenging a purported claim for rescission is moot." (Mem. Opp'n Mot. Summ. J., Doc. # 61, at 13 n.3.)

Xnergy is correct that "rescission" and "rescind" are never used in the Complaint. However, among the remedies requested for Hess' alleged breach of contract is "cancellation of its contract with Hess." (Compl. ¶ 10.)  The word "rescission" means "cancellation."  *See, e.g., Brooks v. Los Angeles County Bureau of Adoptions*, 218 Cal. App. 2d 732, 734 (1963). Xnergy has elected to bring a breach of contract action (as well as an accompanying action for breach of the implied covenant of good faith and fair dealing), and this election bars the remedy of rescission or "cancellation of its contract with Hess."  *See Akin*, 140 Cal. App. 4th at 296.  Therefore, to the extent Xnergy seeks a remedy of rescission or "cancellation" of the Purchase Agreement, Hess' motion for summary judgment is granted.

**III.   Conclusion**

For the reasons stated above, Hess' Motion for Summary Judgment (Doc. # 44) is **GRANTED IN PART** and **DENIED IN PART**, as follows: the Motion for Summary Judgment is **GRANTED** as to Xnergy's affirmative defense of "Anticipatory Breach of

1   Contract"; the Motion for Summary Judgment is **GRANTED** to the extent Xnergy seeks the

2   remedy of rescission or "cancellation" of the Purchase Agreement; in all other respects, the

3   Motion for Summary Judgment is **DENIED**.

4        No later than **seven (7) days** from the date this Order is filed, the parties shall contact

5   the chambers of Magistrate Judge Major to schedule the remaining pretrial dates.

6   DATED:  August 29, 2007

7

8                  **WILLIAM Q. HAYES**
               United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28